AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)   ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

LODGED
CLERK, U.S. DISTRICT COURT
03/14/2025
CENTRAL DISTRICT OF CALIFORNIA
BY: ___AP___ DEPUTY

FILED
CLERK, U.S. DISTRICT COURT
3/14/2025
CENTRAL DISTRICT OF CALIFORNIA
BY: ___D.C.___ DEPUTY

United States of America

v.

Victor Navarro-Cota,

Defendant.

Case No. 5:25-mj-00132

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of March 13, 2025, in the county of San Bernadino in the Central District of California, the defendant violated:

*Code Section*
8 U.S.C. §§ 1326(a)

*Offense Description*
Illegal Alien Found in the United States Following Deportation or Removal

This criminal complaint is based on these facts:

   *Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/
Complainant's signature

Robert Perez, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:  3/14/25

Judge's signature

City and state:  Riverside, California

Hon. Shashi H. Kewalramani
*Printed name and title*

AUSA: _Mirelle Raza_x6058

**AFFIDAVIT**

I, ROBERT PEREZ, being duly sworn, declare and state as follows:

## I. PURPOSE OF AFFIDAVIT

1. This affidavit is made in support of a criminal complaint against Victor Navarro-Cota ("NAVARRO-COTA") charging him with violating Title 8, United States Code, Section 1326(a), Illegal Alien Found in the United States Following Deportation.

2. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show that there is sufficient probable cause for the requested complaint and warrant and does not purport to set forth all my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF AFFIANT

3. I am a United States Border Patrol Agent ("BPA") and have been so employed since 2000. I am currently assigned to the El Centro Station, and I am currently a member of the El Centro Sector Prosecutions Unit. I am a graduate of the Border Patrol Basic Academy at the Federal Law Enforcement Training Center in Glynco, Georgia and a Federal Law Enforcement Officer within the meaning of Rule 41(a)(2)(C) of the Federal Rules of Criminal Procedure. I am authorized by Rule 41(a) of the Federal Rules of Criminal Procedure to make applications for

search and seizure warrants and serve arrest warrants.  I have experience in and have received training with respect to conducting investigations of violations of Titles 8, 18, 19, and 21 of the United States Code.

### III. STATEMENT OF PROBABLE CAUSE

4.   Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

**A.   Agents with CBP Initiate a Traffic Stop of a Black Suburban**

5.   On March 13, 2025, BPAs from Indio Station ("IDO") were working on the Interstate 40 ("I-40") and Interstate 15 ("I-15") corridor near Barstow, California.  The agents were driving both marked, and unmarked, Border Patrol service vehicles equipped with emergency lights and sirens.  BP Agents J. Kim, R. Raymer, R. Herrera, A. Perez, G. Oliver and L. Olivares were involved in this investigation.

6.   Agents positioned their unmarked service vehicle on an onramp observing southbound traffic on I-15.  While not an average patrol vehicle, the unmarked service vehicle has radio antennas on the exterior of the vehicle that are visible, and emergency lights in the interior of the vehicle in the rear and front window, which are visible.

7.   While position on the I-15, agents observed a black 2001 Chevrolet Suburban ("black Suburban") approaching their location traveling south on I-15.  As the black Suburban passed the agent's location, the black Suburban's brake lights

illuminated and abruptly moved from the right to left lane. There were no other vehicles near the Suburban. Based on my training and experience erratic driving behavior is common in prior smuggling, in that vehicles involved in criminal activity will make abrupt and unnecessary lane changes. Agents saw two males in the driver seat and passenger seat of the vehicle. The driver was later identified as Tereso Guadalupe Martinez-Reyes ("MARTINEZ-REYES"), and the passenger was later identified as NAVARRO-COTA. Agents saw a blanket obstructing the view into the rear passenger area.

8. Agents merged onto I-15 ahead of the black Suburban in order to investigate, and noticed that the black Suburban slowed its speed and moved into a lane positioned behind a slow-moving semi-truck. In my training and experience, vehicles involved in smuggling activity will use this driving tactic in an effort to allow law enforcement vehicles to pass their vehicles undetected. Agents queried the black Suburban's license plate, California license plate number 4RVX159.

9. It was revealed the black Suburban was registered to individual with an address in Bell, California, and who is a citizen and national of Mexico illegally present in the United States. A picture of the individual was also revealed through the records query. The individual on the car registration did not visually appear to be in the car.

10. Agents, driving a separate service vehicle, which was a fully marked U.S Border Patrol vehicle equipped with emergency lights and sirens, merged onto the I-15 ahead of the black

Suburban as it approached. When the black Suburban passed the fully marked U.S Border Patrol vehicle, agents saw the black Suburban swerve over the solid white line painted on the right edge of the road. In my training and experience, drivers involved in illicit activity will swerve over the solid white line because they are focused on either the rear, or side, mirrors of their vehicle trying to see a law enforcement vehicle's position to gain any advantage available instead of the road ahead of them causing a major roadway safety concern.

    11.   Agents compared the driver's appearance to the picture of the individual to who the car was registered, and determined the driver did not match the photograph. Additionally, based the driver's behavior and his driving behavior, agents performed a vehicle stop on the black Suburban and it pulled over.

    12.   Agents approached from the black Suburban identified themselves as United States Border Patrol Agents, in Spanish. The driver, MARTINEZ-REYES, and the front passenger, NAVARRO-COTA, were both identified at this time. Agents asked MARTINEZ-REYES to turn off the Suburban and provide any form of identification. MARTINEZ-REYES was visibly shaking when turning over his identification, which was a Mexican Voters Registration card. Based on my training and experience I know this is a document only available to citizens of Mexico.

**B.   The Black Suburban was Filled with 478 Pairs of Nike Shoes**

13.   Agents saw a green blanket obstructing the rear of the black Suburban's interior. In my training and experience, I know that blankets are often hung in vehicles to cover and conceal undocumented aliens. Agents asked MARTINEZ-REYES and NAVARRO-COTA to step out of the vehicle, and removed the blanket.

14.   In the back of the vehicle there were approximately 478 black Jordan shoe boxes packed from the floor to the roof of the vehicle. MARTINEZ-REYES was questioned about the shoes, and stated that the owner of the vehicle gave it to him loaded with the shoes.

 

15.   When MARTINEZ-REYES was asked about the shoes, he stated he was driving them to Los Angeles. MARTINEZ-REYES also

5

stated he was not the owner of the vehicle. MARTINEZ-REYES told agents he did not have immigration documents and was illegally present in the United States. MARTINEZ-REYES was placed under arrest.

16. NAVARRO-COTA told agents that he did not have immigration documents and was illegally present in the United States. NAVARRO-COTA was placed under arrest.

17. During an inventory search of the vehicle, agents found 478 pairs of Nike Jordan 6 Rings shoes which retail for approximately $170.00 USD per pair, totaling $81,260.00 in value.

18. MARTINEZ-REYES and NAVARRO-COTA were transported to the Indio Border Patrol station for further processing. At the Indio Station, MARTINEZ-REYES and NAVARRO-COTA's fingerprints, biographical information, and photograph were entered into the e3/IDENT/IAFIS systems. The system revealed that both had positive immigration history.

C. **Interview With MARTINEZ-REYES**

19. Based on my review of law enforcement reports and recordings, I am aware that on March 13, 2025, at approximately 2:26 p.m. at the Indio Border Patrol Station in Indio, California, MARTINEZ-REYES was advised of his Miranda rights in Spanish. MARTINEZ-REYES stated that he understood his rights and agreed to answer questions without the presence of an attorney.

20. MARTINEZ-REYES stated the following:

a. He is a Mexican citizen from Gomez Palacio, Durango, Mexico. He does not have immigration documents allowing him to reside or work in the United States. MARTINEZ-REYES explained he last entered the United States illegally March 2, 2025, near the international border in El Paso, Texas. MARTINEZ-REYES arranged to pay a human smuggler $8,000 once he was transported to Los Angeles, California.

b. From Texas, he was transported to Albuquerque, New Mexico. Here he met a person named "Turro," who drove MARTINEZ-REYES to Phoenix, Arizona. Upon arriving in Phoenix, MARTINEZ-REYES was taken to a single-story house, which he described as being in an apartment complex. MARTINEZ-REYES stated the house was filled with Nike shoe boxes, Milwaukee tools, clothing, electronics, and various other merchandise.

c. On March 12, 2025, MARTINEZ-REYES, NAVARRO-COTA, "Turro," and a female drove to Flagstaff, Arizona, and stayed at a Motel 6.

d. On March 13, 2024, "Turro" and the female left motel and returned with the black Suburban, which was filled with the Nike shoe boxes. MARTINEZ-REYES and NAVARRO-COTA then drove the black Suburban to California, with an intended destination of Los Angeles.

e. MARTINEZ-REYES stated that during the drive, NAVARRO-CORTA informed MARTINEZ-REYES that all of the merchandise at the home, and the shoe boxes in the black Suburban were stolen from train heists. NAVARRO-COTA said he has previously earned three hundred million Mexican Pesos, or

7

$150,000 United States dollars from transporting merchandise in this same manner.

  f. He was deported from the United States in early February 2025, and has not received permission from the United States Attorney General or the Secretary of Homeland Security to re-enter the United States.

  **D.** **Interview With NAVARRO-COTA**

 21. Based on my review of law enforcement reports and recordings, I am aware that on March 13, 2025, at approximately 3:32 p.m. at the Indio Border Patrol Station in Indio, California, NAVARRO-COTA was advised of his Miranda rights in Spanish. NAVARRO-COTA stated that he understood his rights and agreed to answer questions without the presence of an attorney.

 22. NAVARRO-COTA stated the following:

  a. He is a Mexican citizen from Los Mochis, Sinaloa, Mexico. He does not have immigration documents allowing him to reside or work in the United States. NAVARRO-COTA and four friends walked across the United States and Mexican border near San Luis, Arizona and has been living in Phoenix, Arizona ever since. NAVARRO-COTA stated he was deported around a year ago, and has not received permission from the United States Attorney General or the Secretary of Homeland Security to re-enter the United States.

  b. NAVARRO-COTA and four other men run a scheme of breaking into cargo trains and stealing the merchandise inside. They break into trains that run along the Kingmen, Arizona to Albuquerque, New Mexico railroad track. Specifically, NAVARRO-

8

COTA drives a vehicle alongside the train and picks up merchandise thrown from the train by other co-conspirators. He has been involved in this scheme for at least one month. He stated the leader of his scheme is "Turro."

       c.  On March 12, 2025, NAVARRO-COTA received a call from a man he knows as "Momo," who told him to drive Nike shoes to Los Angeles and that he would be paid $3,000. He said he knows that "Momo" also has a scheme of stealing from trains. He was told he would be accompanying another driver, and NAVARRO-COTA's job was to ensure the driver did not fall asleep. NAVARRO-COTA was told to contact a person named "Chacharas" once in Los Anglese, and that "Chacharas" would pay him $7,8000 for the merchandise.

       d.  This is the third time NAVARRO-COTA has driven shoes to "Chacharas" in Los Angeles.

       e.  On March 12, 2025, MARTINEZ-REYES, NAVARRO-COTA, and "Turro," drove to Flagstaff, Arizona, and stayed at a Motel 6.

       f.  On March 13, 2024, "Turro" left motel and returned with the black Suburban, which was filled with the Nike shoe boxes. MARTINEZ-REYES and NAVARRO-COTA then drove the black Suburban to California, with an intended destination of Los Angeles.

    **E.  NAVARRO-COTA Was Previously Deported on February 16, 2025**

23.  On March 13, 2025, I reviewed NAVARRO-COTA'S immigration history through various Department of Homeland

Security Databases and discovered that NAVARRO-COTA is a Mexican citizen, who was previously removed from the United States on February 16, 2024.  Thus, I know that when NAVARRO-COTA was found in the Central District of California on March 13, 2025, he reentered the country after having been previously removed from the United States. I also discovered:

    a.   Photographs of the subject alien and compared the photographs in these documents to photographs taken at the time of defendant's booking into local law enforcement custody. I thus determined that the immigration documents on the Department of Homeland Security Databases corresponded to NAVARRO-COTA.

    b.   Various documents, in addition to the indicating that defendant is a native and citizen of Mexico. These documents included an Order of a Designated Official, February 16, 2024, ordering defendant removed to Mexico.

24.  Based on my review of the immigration documents, I determined that it does not contain any record of NAVARRO-COTA ever applying for, or receiving from, the Attorney General or the Secretary of Homeland Security, permission to re-enter the United States. Based on my training and experience, I know that such documentation is required to re-enter the United States legally after deportation, and that if such documentation existed, it would ordinarily be found in defendant's DHS A-File.

## IV. CONCLUSION

25.  For all the reasons described above, there is probable cause to believe that defendant has committed a violation of

Title 8, United States Code, Section 1326(a), Illegal Alien Found in the United States Following Deportation.

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this  14th  day of March 2025.

_____
HON. SHASHI H. KEWALRAMANI
UNITED STATES MAGISTRATE JUDGE